UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

JAMES PUGH,

                    Plaintiff,                    **MEMORANDUM & ORDER**
                                                  18-CV-7350(EK)(RLM)

          -against-

RAMIL CASIMIR, et al.,

                    Defendants.

------------------------------------x

ERIC KOMITEE, United States District Judge:

          Plaintiff James Pugh brings claims under 42 U.S.C.

§ 1983 and New York law against Officers Ramil Casimir and John

Sikora of the New York City Police Department, several unnamed

officers, and the City of New York.  The amended complaint

alleges that around three o'clock in the morning on December 30,

2017, two NYPD officers — Casimir and an "unknown other officer"

— brutally assaulted him.  Plaintiff also asserts that the

officers denied him medical care following the assault.

          Defendants now move for summary judgment on all of

Plaintiff's claims.  Plaintiff opposes summary judgment and, in

the alternative, seeks leave to amend his complaint.

          As discussed further below, Plaintiff initially

reported — in a number of settings — that his injuries resulted

from a car crash.  After Plaintiff alleged that he was

assaulted, he gave conflicting testimony about the assault and

the events surrounding it.  He refused to answer defense
counsel's questions at his deposition (saying "I can't recall"
several hundred times).  In addition to those conflicts,
Plaintiff's testimony is contradicted by extensive,
contemporaneous medical evidence from multiple sources, which
show no evidence of bruising consistent with the alleged
assault.

For these reasons and those that follow, the
Defendants' motion is granted as to all federal claims, and I
decline to exercise supplemental jurisdiction over the state-law
claims.  Plaintiff's request to amend the complaint is denied.

## I.    Background[1]

### A.    The Vehicle Pursuit and Crash

Officers Casimir and Sikora were assigned to the
"anti-crime" unit in the NYPD's 75th Precinct, serving the
eastern part of Brooklyn.  Deposition of Officer Ramil Casimir
("Casimir Dep.") 41:11-17, ECF No. 61-10.  In the early-morning
hours of December 30, 2017, the officers were on patrol in an

---

[1] The facts in this order are drawn from the parties' submissions in
connection with the motion for summary judgment, including Defendants' Local
Rule 56.1 Statement ("Def. 56.1" (ECF No. 57)), and Plaintiff's opposition to
this statement ("Pl. 56.1" (ECF No. 54)).  The facts are viewed in the light
most favorable to Plaintiff.  Citations to a party's Rule 56.1 Statement
incorporate by reference the documents cited therein.  For convenience,
Defendants' supporting memorandum of law will be referred to as "Def. Br."
(ECF No. 58) and Plaintiff's opposition submission as "Pl. Opp." (ECF No.
53).

unmarked NYPD vehicle (a black SUV).  *Id.* at 69:3-21.  Officer Sikora was driving; Officer Casimir was the passenger.  *Id.* at 71:10-11.

At 3:49 a.m., the officers received a report that a late-model sedan had fled a car stop at Linden Boulevard and Pennsylvania Avenue in Brooklyn.  *Id.* at 76:13-80:25, 87:9-24.  Shortly thereafter, the officers encountered Pugh's vehicle and gave chase.  *Id.* at 97:11-14.  According to Casimir, Pugh's sedan was traveling at a high rate of speed, running several red lights before merging onto Grand Central Parkway.  *Id.* at 97:18-23, 108:21-25.  Plaintiff "does not concede" that he ran any red lights or drove recklessly.  *See* Pl. 56.1 ¶ 14 (noting that Defendants produced "no red light cameras or corroborating evidence" for the claim).

In a sworn declaration filed long after his deposition,[2] Plaintiff asserted that he "thought this was a robbery" because the officers did not identify themselves as police and the area in which the pursuit occurred, "East New

_____

[2] Pugh filed his sworn declaration more than a year after his deposition, long after the close of discovery, and months after the Defendants had submitted their summary judgment motion.  *See* Declaration of James Pugh ("Pugh Decl.") ¶ 33, ECF No. 62.  Through the declaration, Plaintiff attempted to fill several gaps in his deposition testimony.  This factual recitation relates several of the declaration's assertions for context.  I conclude below, however, the declaration's contents should be disregarded under Second Circuit precedent.  *See infra* Part IV.A.2.a.

York, is known for late night robberies and car jackings."  Pugh Decl. ¶¶ 12, 13.

Plaintiff's vehicle then crashed into a guardrail and light pole in the median strip of the parkway.  Casimir Dep. 108:24-109:4 (describing the collision); Deposition of James Pugh ("Pugh Dep.") 100:16-17, ECF No. 61-12 (same); *see also* Police Accident Report ("Accident Rep.") at D001-D003, ECF No. 59-17.  The air bags deployed.  Prehospital Care Report ("Prehospital Rep.") at 3, ECF No. 59-7.  The parties dispute the cause of the crash.

    1.   <u>The Alleged Ramming</u>

Plaintiff's account of the crash is internally inconsistent, as discussed more fully below.  Part — but by no means all — of this inconsistency stems from intransigence: at Plaintiff's deposition, for example, he answered "I can't recall" in response to more than 500 questions, including such basic questions as "Why were you driving on the Grand Central Parkway," *see* Pugh Dep. 92:8-10; and "You don't recall anything that happened on the Grand Central Parkway that night?"  *Id.* at 94:20-22 (A. I can't recall.).  Pugh was not, apparently, happy to be deposed.  *E.g.*, *id.* at 132:18-24 (Pugh responds to a question with a question, as follows:  Q. Is there a reason why you cannot recall [whether Pugh was transported to a hospital]? A: Is there a reason why you are asking me these dumbass

4

questions?).  This behavior continued even after Pugh's counsel
asked to go off the record for a time to speak with his client.
*Id.* at 94:22-25.[3]

In this vein, Plaintiff initially testified that he
had no recollection of anything that occurred that night on the
Grand Central Parkway.  *See id.* at 94:17-95:7.  He then
testified, however, that the unmarked police vehicle hit his
car: "Police ran me off the road."  *Id.* at 95:12.  "They were
behind me and no flash, no lights . . . Got on the highway and
boom.  They hit me from behind and I spun.  Once I spun, I hit
the railing."  *Id.* at 95:14-21.  Later in the deposition, he
testified again that he did not recall whether the officers'
vehicle came into contact with his.  *Id.* at 98:5-7.

Pugh's testimony was also inconsistent about the
manner in which the officers' vehicle struck his car.  He
initially testified that he did not remember where the officers'
vehicle was in relation to his car prior to impact.  *See id.* at
96:23-24 (Q. What side of your vehicle was the driver [of the
officers' SUV] on?  A. I can't recall.); *id.* 98:3-4 (Q. Do you

---

[3] Asked how he got to Brookdale Hospital, Plaintiff answered (falsely):
"I flew there."  Pugh Dep. 133:16-17.  At oral argument, Plaintiff's counsel
said that this posture stemmed from Pugh's anger about defense counsel having
giggled upon learning of the death of Pugh's friend, Basheem Graham.  *See*
Transcript of Oral Argument dated July 30, 2021 ("Oral Argument Tr.") 19:25-
20:13, ECF No. 66.  Defense counsel denied "giggling" about that subject
during the deposition.  *See* Pugh Dep. 123:24-124:3.  In any event, Pugh had
already answered "I can't recall" more than 400 times *before* the colloquy
about Basheem's death.

remember how your car was crashed?  A. I can't recall.).  Pugh
then gave inconsistent answers about where on his car the impact
occurred.  *Compare id.* at 99:24-100:1 (Q. What side of your
vehicle did the black car hit?  A. Passenger side.) *with* 157:24-
158:2 (Q. It is your testimony after speaking to your attorney
that you were hit on the left side of your vehicle?  A. Yes.).

Officers Sikora and Casimir, for their part, deny that
their vehicle made contact with Plaintiff's car at all.  Casimir
testified that he and Sikora followed Pugh at a distance and
caught up only after Pugh crashed into the median.  Casimir Dep.
102:24-103:20.  Casimir testified that he "saw a crash in the
distance," *id.* at 120:7; only after he "pull[ed] up directly
behind" Pugh's car did he see it had "crashed into a guardrail,"
causing a "light pole" to fall "onto an innocent motorist that
was traveling in the same direction." *Id.* at 120:8-14.

2.   The Alleged Assault

Plaintiff testified that following the crash, two
police officers pulled him from his car, Pugh Dep. 101:13-22,
103:1-15, and brutally beat him: "they just came over to me with
a nightstick, and little black thing they whipped out and
started swinging [and] hitting and I covered up." *Id.* at 108:9-
12.  Plaintiff attributes the assault to the officers in the
black SUV, but he offers few specifics as to which officer

engaged in any particular conduct (either by name or by the officers' descriptions).[4]

Plaintiff testified that one officer — he did not remember which beyond the officer's orientation with respect to Pugh's car — punched him in the face. *Id.* at 110:2-7. He was beaten on his "legs, my arm, my back. Once they hit me in the knee, they heard it go crack and they still kept beating, beating, beating." *Id.* at 111:10-13. He testified that he was struck "50 or 60 times . . . [over] [m]y whole body." *Id.* at 112:1-5.

Plaintiff refused, however, to answer most follow-up questions about the assault at his deposition. He professed (at times) not to recall the following facts, among many others: whether the officers wielded one weapon or more than one during the beating,[5] *id.* at 114:9-10; how he was positioned during the

_____

[4] Officer Casimir is black, *see* Casimir Dep. 11:14-15, and, according to Plaintiff, Sikora is white. *See* Pugh Decl. ¶¶ 17-18. Plaintiff says that after the accident, one officer came to the driver's side of his car and one to the passenger side, but he does not remember which officer was which (by name or description), Pugh Dep. 106:8-107:10; and he could not remember which officer pulled him out of the car, except that it was the (undescribed) officer on the driver's side. *Id.* at 106:22-107:10. He was also unable to remember which officer punched him in the face, *id.* at 110:4-7, or which one handcuffed him. *Id.* at 118:15-16.

[5] The amended complaint (the "complaint" or "Compl.") alleges that Plaintiff "was . . . hit with a retractable metal bar" (singular). Compl. ¶ 16, ECF No. 19. In his deposition, Pugh first asserted that both of the officers who assaulted him carried weapons. Pugh Dep. 111:7-9. He referred to those devices alternatively as "a nightstick, and little black thing," *id.* at 108:10, and "the little black sticks." *Id.* at 110:17. Then, later in the deposition, asked whether "it was one or more than one [stick]," he replied

assault, *id.* at 114:16-21; whether he said anything during the beating, *id.* at 114:22-23; whether the officers said anything, *id.* at 114:24-25; how long the assault lasted, *id.* at 115:1-2; whether and when other officers arrived at the scene, *id.* at 115:11-13; whether he was intoxicated, *id.* at 117:3-5; what happened after the assault, *id.* at 120:19-21; whether he complained about his injuries or requested medical care at any point, *id.* at 121:3-10, 124:17-23; whether he resisted, *id.* at 125:11-16; whether he had any bruises as a result of the alleged beating, *id.* at 120:5-7; whether he sustained any physical injuries other than the knee injury, *id.* at 137:6-9; and whether he told anyone at the hospital that he had been assaulted.  *Id.* at 141:18-20.

In his later-filed declaration, however, Plaintiff professed to recall some of these same details, and he contradicted other testimony.  Most notably, in contrast to his deposition testimony, Pugh's declaration attempted to ascribe particular conduct to one officer or the other with greater specificity:  "I was able to exit [Pugh's] vehicle on my own and stand up.  Almost immediately after I had stood up both the white male driver [of the SUV] and the black male passenger

---

"I can't recall."  *Id.* at 114:6-10.  Finally, in his later declaration, Pugh again referred only to a single weapon (a baton):  "I was kicked, punched, kneed and hit with what I believe was a black metal baton . . . . I believe Ramir [sic] Casimir was the officer who broke my leg with the baton."  Pugh Decl. ¶ 33.

immediately started attacking me and knocked me to the ground."
Pugh Decl. ¶¶ 31-32.  The declaration named Casimir as the
officer who Plaintiff "believe[d]" "broke my leg with the
baton." *Id.* ¶ 33.

Pugh also indicated, among other things, that: he
exited the vehicle on his own (rather than being pulled out),
*id.* ¶ 31; he was "kicked [and] kneed," in addition to being
punched, *id.* ¶ 33; his leg fracture and facial laceration
resulted from the assault, not the crash, *id.* ¶ 34; he did not
resist the officers, *id.* ¶ 36; he told the officers he had
broken his leg, *id.* ¶ 38; an ambulance was on the scene "almost
immediately," *id.* ¶ 39; he yelled to the ambulance for help, *id.*
¶ 40; and he told the officers — prior to being put in their
vehicle — that he could not stand because his leg was broken and
he was in pain.  *Id.* ¶¶ 38, 42-45.

The two NYPD officers both deny that they assaulted
Pugh or that they witnessed any other officer do so.  Casimir
Dep. 212:20-213:14; Declaration of Officer Sikora ("Sikora
Decl.") ¶¶ 13-15, ECF No. 59-22.  The officers also stated that,
being assigned to the anti-crime unit, they did not carry
nightsticks or batons.  Casimir Dep. 61:10-63:4; Sikora Decl.
¶ 15.  Casimir testified that he approached Plaintiff's vehicle
after the accident, Casimir Dep. 124:15-16, and saw that it was
seriously damaged.  *Id.* at 124:19-20.  Plaintiff was attempting

to exit the vehicle from the passenger-side window.  *Id.* at
127:8-128:16.  Casimir testified that he "assisted [Plaintiff]
in exiting the vehicle" because Plaintiff was having
difficulties doing so on his own "[d]ue to the severe damage" to
Plaintiff's car.  *Id.* at 127:22-128:3.

Officer Sikora declared that he attended to the
occupants of another vehicle at the scene, which had been
damaged when the light pole that Pugh hit had fallen onto it.
Sikora Decl. ¶ 7 ("Upon exiting my vehicle, I went to assist the
individuals whose vehicle had the lamp post on top of it.").
Sikora assisted the occupants of that vehicle while Casimir
assisted Plaintiff out of his vehicle.  *Id.*; Casimir Dep. 129:2-
130:2.

At 3:58 a.m., Officer Casimir arrested Plaintiff for
driving with a suspended license.  Casimir Dep. 132:2-4; Arrest
Report, ECF No. 59-21.  The officers then transported him to the
75th Precinct.  Casimir Dep. 132:2-4.  According to Casimir, it
was on route to the precinct that Plaintiff complained for the
first time that his knee hurt.  *Id.* at 145:14-19.  Pugh and the
officers arrived at the precinct around ten minutes after they
left the scene of the accident.  *Id.* at 196:11-13.

B.   **Plaintiff's Medical Treatment**

At approximately 4:17 a.m., the police called
Emergency Medical Services (EMS) to the 75th Precinct.

10

Prehospital Rep. at 1.   At 4:38 a.m., Emergency Medical
Technicians Koehler and LaRocca examined Plaintiff there.
Deposition of EMT Larocca ("LaRocca Dep.") 10:5-12, ECF No. 59-
8; Prehospital Rep. at 1 (patient contact).   Plaintiff had a
"laceration on his face," and a "deformed" knee.   LaRocca Dep.
10:5-16, 58:19-59:8; *see also* Prehospital Rep. at 3.

        LaRocca testified that Plaintiff told the EMTs he had
hurt his face and knee in a car accident.   LaRocca Dep. 10:5-12.
LaRocca testified that Plaintiff said he "hit his face on the
steering wheel."   *Id.* at 13:22-25.   The Prehospital Care Report
signed by EMT Koehler records this statement.   Prehospital Rep.
at 3 ("ACCORDING TO NYPD PT [PATIENT] HIT LIGHT POLE WITH CAR. .
. . PT STS [STATES] HE HIT HIS FACE ON THE STEERING WHEEL.").
At no point did Plaintiff tell Emergency Medical Services that
the police assaulted him.   LaRocca Dep. 61:10-25; Deposition of
EMT Koehler ("Koehler Dep.") 31:3-25, ECF NO. 59-9; Prehospital
Rep. at 3.   Plaintiff was taken to Brookdale Hospital shortly
before 5:00 a.m.   Prehospital Rep. at 1.

        The "Inpatient Record" created at Brookdale Hospital
reports that "Per EMS, Pt. was intoxicated" and "slid on black
ice."   Brookdale Records at D249, ECF No. 59-10.   Medical staff
detected alcohol, cannabinoid, and opioids in Plaintiff's
blood.   *Id.* at D0268.   Doctor Phillip Harris, one of the
physicians who treated Plaintiff at Brookdale, reported that

11

Pugh's "head hit [the] steering wheel and he lost consciousness

+ left knee and face pain." *Id.* at D0315.[6]  Pugh's tibia was

fractured.  *Id.* at D0275.  The record of Plaintiff's treatment

at Brookdale contains no indication, however, of bruising or

other injuries, aside from the laceration on Pugh's head and the

tibia fracture.  *See id.* ("No other injuries identified.").

## II.  Procedural History

Plaintiff filed a Notice of Claim, through counsel,

with the New York City Comptroller in March 2018.  *See* ECF No.

59-19.  The Notice of Claim alleged that Pugh "was attacked by

New York City Police Officers" and "sustained severe injuries

from the attack."  *Id.* at 1.  The notice made no mention,

however, of the accident, or any contact between the police

vehicle and Pugh's car during the pursuit.  Nor did it name

either Casimir or Sikora, at least explicitly; instead, it named

the NYPD and "Jane and John Does 1-10."  *Id.*

Pugh brought suit in this Court in December 2018.  ECF

No. 1.  The original complaint alleged that Officer Casimir and

---

[6] The Brookdale records also show that Andrew Hayden, M.D., consulted
with Plaintiff on December 30, 2017 at 9:13 a.m. (about six hours after the
accident).  *Id.* at D0307.  Hayden's notes appear to reflect his conversation
with Pugh personally, as they discuss a prior injury — a gunshot wound — that
Pugh suffered ten years earlier.  *See id.* ("James Pugh is a 43 y.o. male . .
. . Reports GSW [gunshot wound] . . . 10+ yrs ago.").  Pugh did not,
apparently, mention the assault to Doctor Hayden, either: the only sources of
injury reflected are "MVA (motor vehicle accident)" and the "GSW" (the
previous gunshot wound).  *Id.*  A number of other doctors and medical
personnel met with Plaintiff; none of them indicated that Plaintiff ever
complained of being assaulted.  *See id.* at D0287-D0306, D0309-D0315.

an unnamed officer perpetrated the assault.  *Id.* ¶¶ 13-14.  Like the Notice of Claim, however, the initial complaint omitted any allegation that the officers' vehicle hit Plaintiff's car.  *Id.* The initial complaint also did not name Sikora as a defendant or contain any specific allegations about the SUV driver's participation in the assault.  *See id.* ¶¶ 12-32.

On October 28, 2019 — almost five months after that deadline — Plaintiff sought leave to amend his complaint to (i) add Officer Sikora as a defendant; (ii) allege that the officers' vehicle hit Plaintiff's car; (iii) name Sikora as one of the two officers who assaulted him; and (iv) allege that Sikora was "deliberately indifferent to Mr. Pugh's injuries and the denial of his medical services, or [at] the most, directly involved in Mr. Pugh's injuries."  ECF No. 13.  Judge Mann denied this application on the ground that Pugh had not shown good cause for the delay in bringing it or reasonable diligence under Rule 16 of the Federal Rules of Civil Procedure.  ECF No. 16.  She added, though, that Plaintiff could amend the complaint

to add Officer Sikora as a defendant *if* all defendants consented, *id.*, which they did.  ECF No. 17.

Thus, Pugh filed an amended complaint — the complaint that is currently operative — on November 8, 2019.  ECF No. 19. That complaint includes Sikora's name in the caption; and as a "Defendant," Sikora is named in every count except for Counts Eight and Nine, which allege supervisory and *Monell* liability against the City.  Beyond that, however, the complaint simply names Sikora as a citizen of the United States, a resident of New York State, and an NYPD officer (sued in his individual and official capacities).  It contains no specific allegations about his conduct.

The complaint brings claims under 42 U.S.C. § 1983, alleging excessive force, failure to intervene, deliberate indifference to medical needs, and supervisory liability in violation of the Fourth, Eighth, and Fourteenth Amendments. Compl. ¶¶ 34-43, 67-69.[7]  The complaint also alleges claims arising under New York State law, including excessive force in violation of Article 1, Section 12 of the New York State Constitution, as well as common-law claims for assault and battery, intentional infliction of emotional distress, "negligent retention of employment services," and negligence.

---

[7] Plaintiff also brings a claim under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  *Id.* at ¶¶ 70-71.

*Id.* ¶¶ 44-66.  Plaintiff requests, among other things, compensatory and punitive damages, as well as fees and costs. *Id.* at 11-12.

Pugh was deposed on November 15, 2019.  *See* ECF No. 61-12.  Casimir was deposed twelve days later.  ECF No. 61-10. EMT LaRocca was deposed in December 2019, ECF No. 59-8, and EMT Koehler in January 2020.  ECF No. 59-9.  Plaintiff did not depose Officer Sikora, but Sikora submitted a timely declaration.  ECF No. 59-22.

In January 2020, just before the close of discovery, Pugh moved for reconsideration of Judge Mann's order denying his application to supplement his complaint with additional facts. ECF No. 35.  Judge Mann denied this request in two subsequent, written orders.  ECF Nos. 36, 39.

Discovery closed on January 31, 2020.  ECF No. 39. Pugh's declaration, which spans sixty-one paragraphs and makes extensive new factual claims, did not appear for a long time thereafter.  It is dated January 7, 2021 — nearly a year after discovery closed.[8]  ECF No. 62.  The declaration's date is also approximately fourteen months after Pugh sat for his deposition, and — importantly — more than four months after the date of

---

[8] Pugh did not actually file the Declaration on ECF until June 30, 2021, ECF No. 62, but it appears to have been shared with the Defendants in January of that year.

Defendants' summary judgment motion (September 1, 2020).  ECF
No. 56.

Defendants now move for summary judgment.  *Id.*  They
argue: (1) the unnamed defendants should be dismissed based on
Plaintiff's failure to identify and serve them; (2) Plaintiff's
excessive force and assault claims against Officers Casimir and
Sikora should be dismissed because he has adduced insufficient
evidence that either was personally involved in the assault;
(3) putting aside who was involved, Plaintiff has not
established a genuine dispute of fact as to whether an assault
occurred at all; (4) Plaintiff failed to identify adequate
evidence that any defendant was deliberately indifferent to his
medical needs; (5) Defendants are entitled to qualified
immunity; (6) the City should be dismissed because Plaintiff did
not adequately establish that the City failed to discipline its
officers pursuant to *Monell v. Dep't of Soc. Servs. of City of
New York*, 436 U.S. 658 (1978); and (7) Plaintiff's state-law
claims must be dismissed based on his failure to sit for an
examination requested under New York General Municipal Law 50-h
— a condition precedent for the state claims — despite the
examination having been rescheduled five times.  *See* Def. Br. at
1, 24.

### III. Summary Judgment Standard

Summary judgment is appropriate if the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  "A fact is material for these purposes if it might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[9]

The movant has the burden of demonstrating the absence of a question of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  If the movant carries its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  If the non-moving party fails to do so, the claim must be dismissed.  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

---

[9] Unless otherwise noted, when quoting judicial decisions this order omits all alterations, citations, footnotes, and internal quotation marks.

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment*." Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  Rather, the opposing party must establish the dispute of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  Testimony that is "wholly fanciful" cannot create an issue of fact*. D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

### IV.  Discussion

#### A.  Excessive Force

Police use of force violates the Fourth Amendment when an officer's conduct is "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Cruz v. City of New York*, 232 F. Supp. 3d 438, 451 (S.D.N.Y. 2017) (quoting *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004)).  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490

18

U.S. 386, 396 (1989).  But it is axiomatic that the gratuitous use of force against an arrestee violates the Fourth Amendment. *Id.* at 395.

And police officers who witness the excessive use of force are duty-bound to intervene.  Under Section 1983, officers are liable when they breach their "affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in [their] presence by other officers."  *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).

Plaintiff asserts two separate instances of excessive force: first, that Officers Casimir and Sikora used excessive force against him by "ramming" his car and forcing it off the road, and second, that they assaulted him with metal batons and a punch.  I take these in turn.

1.  The Alleged Collision with Plaintiff's Car

Neither Plaintiff's complaint nor his Notice of Claim alleges that the police hit his vehicle while in motion or otherwise forced him off the road.  Instead, Plaintiff raised this claim for the first time in a motion to amend (which Judge Mann denied).  *See* ECF Nos. 13, 14.  He then raised this claim in opposition to this motion for summary judgment.  *See* Pl. Br. at 2.

A plaintiff may not amend the complaint or alter his theory of liability in a memorandum of law in opposition to

19

summary judgment.  *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims." (quoting 5 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1183, at 23 n.9 (3d ed. 2004))); *see also Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (district court properly declined to consider a new theory of liability raised for the first time in opposition to summary judgment); *Porter v. New York Univ. Sch. of L.*, No. 99-CV-4693, 2003 WL 22004841, at *12 (S.D.N.Y. Aug. 25, 2003), *aff'd*, 392 F.3d 530 (2d Cir. 2004) (claims raised for the first time in opposition to summary judgment should be "disregarded"); *Heletsi v. Lufthansa German Airlines, Inc.*, No. 99-CV-4793, 2001 WL 1646518, at *1 n.1 (E.D.N.Y. Dec. 18, 2001) (observing that "[a] party cannot amend their complaint simply by alleging new facts and theories in their memoranda opposing summary judgment"). Therefore, Plaintiff may not proceed on this theory of liability.

    2.   <u>The Alleged Assault</u>

       Plaintiff's remaining case for excessive force is predicated on the alleged beating after the crash.  As noted above, the Defendants deny that any such assault occurred.

Plaintiff's case rests entirely on his own deposition testimony and his later-filed declaration.[10]

The declaration is not cognizable. "The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) (citing cases). This rule is designed to protect the integrity of the discovery and summary-judgment processes: "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969); *see also* 10A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 2726.1 (4th ed. 2021) ("An interested witness who has given clear answers to unambiguous questions cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, without providing a satisfactory explanation of why the testimony is changed.").

---

[10] Plaintiff also cites to a report prepared by a physician opining as to the cause of his injuries. For the reasons set out in Part IV.A.2.c, this report is inadmissible.

The detailed recitation of events in Plaintiff's declaration directly contradicts his inability (or unwillingness) to recall basic details of the incident at his deposition.  The declaration therefore cannot be the basis of a dispute of material fact.  *See, e.g.*, *Kennedy v. City of New York*, 570 F. App'x 83, 84—85 (2d Cir. 2014) ("We have applied this principle to affirm a grant of summary judgment against a party who testified in his deposition that he was unable to remember a particular fact, and then, in response to a summary judgment motion, submitted an affidavit claiming a recollection of events that would have raised an issue for trial."); *Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 46 (2d Cir. 2005) (affirming district court's dismissal of claims, where later—filed declaration contradicted plaintiff's deposition testimony that he could not remember having complained to anyone at his company about discrimination); *Medure v. Vindicator Printing Co.,* 273 F. Supp. 2d 588, 639 (W.D. Pa. 2002) (defendant who testified "I don't recall" on issue of importance at deposition could not meet her "burden on a motion for summary judgment by submitting a declaration" that "contradicts her deposition testimony").

And Pugh has offered no satisfactory explanation for the disparity.  He said nothing at the time he submitted the declaration following his memorandum in opposition.  At oral

argument on the motion for summary judgment, Plaintiff's counsel
noted that Pugh was upset at his deposition because he believed
that defense counsel had laughed upon hearing of the death of
Pugh's friend (and passenger on the night in question), Basheem
Graham.  *See* Oral Argument Tr. 19:25-20:13.  This explanation is
unavailing, given that Pugh had already answered "I can't
recall" hundreds of times before the subject of Graham's death
came up.  Indeed, Pugh began responding that he could not recall
very soon after the deposition began.  *See* Pugh. Dep. 9:1-6
(first "I can't recall" response); 123:17-18 (first reference to
Graham's passing, more than 100 transcript pages later).  And an
explanation from Plaintiff's attorney would be insufficient,
even if it were credible.  *See, e.g.*, *Beckel v. Wal-Mart
Assocs., Inc.*, 301 F.3d 621, 623-24 (7th Cir. 2002) (attorney's
explanation for the inconsistency in plaintiff's memory was
merely unsworn argument).  The declaration must therefore be
disregarded.

      a.   Plaintiff's Testimony About the Assault

      Plaintiff's remaining evidence consists entirely of
his deposition testimony.  A plaintiff's testimony may be enough
to survive summary judgment, even without corroboration, as long
as it is not "simply incredible," "contradictory and
incomplete," or "so replete with inconsistencies and
improbabilities that no reasonable juror could credit it."

*Adamson v. Miller*, 808 F. App'x 14, 17 (2d Cir. 2020) (cleaned up) (citing *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019)); *see also Jeffreys*, 426 F.3d at 554.

As noted above, the Plaintiff did testify to the assault at his deposition, despite his serial "I can't recall" answers. Asked what was the "next thing you recall after someone gestured to you to pull over," Plaintiff responded: "Me getting my ass beat is what." Pugh Dep. 97:25-98:2. Pugh went on to testify that unnamed officers "whipped out" a "nightstick, and little black thing," after which they "started swinging [and] hitting and I covered up." *Id.* at 108:9-12. Pugh testified that an officer punched him in the face. *Id.* at 110:2-3. He was beaten on his "legs, my arm, my back. Once they hit me in the knee, they heard it go crack and they still kept beating, beating, beating." *Id.* at 111:10-13. He was hit "50 or 60 times . . . [over] my whole body." *Id.* at 111:23-112:5.

These are gravely serious allegations. As set out below, however, dismissal is warranted here because Plaintiff's account is both "replete with inconsistencies and improbabilities," *Jeffreys*, 426 F.3d at 555, and contradicted by the medical record. *See Davis v. Klein*, No. 11-CV-4868, 2013 WL 5780475, at *4 (E.D.N.Y. Oct. 25, 2013).

First and foremost, Pugh has been inconsistent on the subject of whether any assault occurred at all.  His deposition testimony on this score is contradicted, first, by his statements to the emergency medical technicians who treated him after his arrest: Pugh told the EMTs he was injured in the car crash.  EMT LaRocca testified that Pugh made this statement, and LaRocca's partner, EMT Koehler, recorded this statement in the contemporaneous medical record, explicitly attributing it to Pugh.[11]  At no point did Plaintiff tell EMS that the police assaulted him.  LaRocca Dep. 61:10-25; Koehler Dep. 31:3-25; Prehospital Rep. at 3; *see Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 475-76 (S.D.N.Y. 2003)*, aff'd sub nom. Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) (granting summary judgment on excessive-force claim because, among other things, "Jeffreys made no mention of the alleged beating to EMS workers, doctors [or] nurses").

Plaintiff attempted to explain the inconsistency between these statements and his deposition testimony in his late-filed Declaration, writing that he "didn't speak to anyone

---

[11] LaRocca testified: "We went to [Pugh], asked him what happened, and he stated that he was in a car accident and that his knee hurt and then I could also see that he had a laceration on his face."  LaRocca Dep. 10:8-12. Asked, "So did anyone tell you how the laceration on his face happened?" LaRocca testified: "The patient said he hit his face on the steering wheel." *Id.* 13:22-25.  The EMTs' "Prehospital Report" reflects this statement: "ACCORDING TO NYPD PT [PATIENT] HIT LIGHT POLE WITH CAR. . . . *PT STS* [Patient states] HE HIT HIS FACE ON THE STEERING WHEEL."  Prehospital Rep. at 3 (emphasis added).

once the EMTs arrived because I didn't want to be taken from

help again." Pugh Decl. ¶ 52. This statement, too, is

inconsistent with the EMTs' testimony, insofar as the EMTs

testified that Pugh *did* speak to them.

       b.  Plaintiff's Criminal Defense Attorney's Admission

      The record suggests that Pugh also told his *own*

*lawyer*, at a later date and in safer confines, that he was

injured in the car accident. Pugh was charged with several

crimes in New York State Supreme Court, Kings County, for his

reckless driving on the night of December 30th: aggravated

unlicensed operation of a motor vehicle; reckless driving;

reckless endangerment; and circumvention of an ignition

interlock device. *See* Certificate of Disposition, ECF No. 59-

20. He eventually pleaded guilty to aggravated unlicensed

operation in the second degree. *Id.*

      Before Pugh's conviction, however, Justice Raymond

Rodriguez held a "*Dunaway / Huntley*" hearing on May 10, 2018 —

more than four months after Pugh's arrest. The purpose of the

hearing was to determine the admissibility of Pugh's statements,

made in the aftermath of the accident, that he was in a rush to

get home and that he knew his license was suspended. Criminal

Court Transcript D0957:22-24, D0967:1-4, ECF No. 61-11.[12]
Officer Casimir testified for the prosecution and was cross-
examined by Pugh's criminal defense counsel.  The parties
discussed Pugh's car crash at length; no one suggested that the
police had hit Pugh's car while in motion.[13]  At the close of the
hearing, the judge referred to Pugh's having been injured in "a
pretty horrendous car accident" for which he "had to go to the
hospital."  *Id.* at D0980:19-21.  Pugh's counsel then told the
court that Pugh injured his knee in a car accident: "*My client
tells me* that . . . he received an injury, he had knee
replacement surgery so he's still going through physical therapy
*as a result of this car accident*."  *Id.* at D0981:9-14 (emphases
added).

This statement is attributable to Plaintiff and
admissible over a hearsay objection.  Statements made by an
attorney concerning a matter within his employment are generally
admissible against the client.  *See United States v. Margiotta*,
662 F.2d 131, 142-43 (2d Cir. 1981) (citing Fed. R. Evid.
801(d)).  This is because attorneys have "prima facie speaking

---

[12] Casimir testified:  "At that point I asked the defendant, is there a
reason why you were driving in such a manner and he stated that he was going
home, in a rush to get home to his kids and that his license was suspended or
bad."  *Id.* at D0967:1-4.

[13] Casimir testified that Pugh's vehicle came to a stop "[a]fter
colliding with a guardrail and a light pole," fifty to seventy-five feet in
front of Casimir's vehicle.  *Id.* at D0965:9-12.

authority to make relevant judicial admissions related to the management of litigation." *Bensen v. Am. Ultramar Ltd.*, No. 92-CV-4420, 1996 WL 422262, at *10 (S.D.N.Y. July 29, 1996). Statements made by a party's agent "do not implicate the rule against hearsay, and are admissible subject to generally applicable rules involving, *e.g.*, relevance and potential for unfair prejudice or confusion." *United States v. Demizio*, No. 08-CR-336, 2009 WL 2163099, at *3 (E.D.N.Y. July 20, 2009). And when a party makes a representation in one case that is inconsistent with a position the same party takes in another, the later court may consider such inconsistencies. *E.g., United States v McKeon*, 738 F.2d 26, 31 (2d Cir. 1984).

The party offering an admission by a party's agent under F.R.E. 801(d)(2) must establish: (1) agency; (2) that the statement was made during the course of the agency; and (3) that the statement relates to a matter within the scope of the agency. *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992). Still, the Second Circuit has opined that admissibility under Rule 801(d)(2) "should be granted freely."[14]

---

[14] The directive to admit such statements "freely" applies in the civil context but not to attorney statements sought to be introduced in criminal cases. "[C]are must be exercised in the criminal context in determining under what circumstances attorney statements may be used against a client," "because the routine use of attorney statements against a criminal defendant risks impairment of the privilege against self-incrimination, the right to counsel of one's choice, and the right to the effective assistance of counsel." *United States v. Valencia*, 826 F.2d 169, 172 (2d Cir. 1987).

*Id.; see also Wechsler v. Hunt Health Sys., Ltd.*, No. 94-CV-
8294, 2003 WL 22764545, at *2 (S.D.N.Y. Nov. 21, 2003)
(admitting attorney's statement made in a discovery request
against his client).

An attorney's statement may be admitted under this
rubric even if made in a relatively informal context.  In *Lopez
v. Ramirez*, for example, after the plaintiff argued that certain
injuries resulted from a 2009 accident, the district court
allowed the defendant to introduce a letter sent by plaintiff's
attorney to an administrative law judge in a disability
proceeding, wherein the attorney described plaintiff's injuries
in an earlier — 2007 — accident.  No. 11-CV-0474, 2019 WL
3779277, at *11 n.12 (S.D.N.Y. Aug. 12, 2019).  In *Bensen,
supra,* 1996 WL 422262, at *6-14, the court admitted certain
attorneys' statements — made in a memorandum summarizing an
"informal meeting" and elsewhere — as admissions of the client.
*Id.* at *10-11.[15]  If anything, the circumstances here favor
admission even more heavily than in those cases: Pugh's criminal
attorney's counsel made the statement on the record, with a

---

These Fifth and Sixth Amendment rights are not, of course, implicated in the
instant civil case.  Moreover, even in the criminal context, "the trial judge
must be accorded considerable discretion in determining the application of
Rule 801(d)(2) to statements of an attorney offered by the prosecution against
a criminal defendant."  *Id.* at 173.

[15] The court later excluded certain of the statements contained in the
memorandum and documents "to the extent they contain[ed] lawyers' opinions on
legal issues" under Rules 403 and 701 of the Federal Rules of Evidence.  *See
id.* at *12-14.

court reporter present, in a criminal case, and in Pugh's presence. *See id.* at *11 (according weight to the fact that client was present at meeting where attorney made the statement sought to be introduced); *cf. Valencia*, 826 F.2d at 173 (facts that statement was "not made in court" and not transcribed weighed against admissibility in criminal case).[16]

Plaintiff's statement to his criminal defense attorney supports summary judgment. In *Jeffreys v. Rossi*, for example, the court granted summary judgment to police-officer defendants in an excessive force case, based in part on the fact that the plaintiff had failed to mention the alleged beating in his criminal case. 275 F. Supp. 2d at 470. Judge Scheindlin noted that "the criminal record [was] devoid of any allegations of police misconduct" and that while she could not "rule out the possibility that Jeffreys told his defense counsel about the alleged beating, I can think of no reason why, if he had, [counsel] would not have used that information during the course of the criminal proceedings." *Id.* at 476.

c.   Other Inconsistencies

Plaintiff contradicted his deposition testimony on other subjects as well. These include the manner in which he

---

[16] *See supra* note 14 (noting the different considerations that apply when attorney statement is sought to be admitted against defendant in a *criminal* case).

exited his car after the crash.  At his deposition, Pugh was
adamant that the police officers dragged him out of his car:
"after the bump [*i.e.*, the police SUV hitting his back bumper],
I crashed into the divider.  When I crashed into the divider,
*the police ran to the car and pulled us out* of the car and beat
me."  Pugh Dep. 101:15-18 (emphasis added).  Pugh testified that
he was wearing a seat belt and his body "stayed exactly where it
was" after the accident until "I was dragged out of the car."
*Id.* at 102:15-22.  Counsel asked: "when you say you were dragged
out of the car, who dragged you out of the car?"  Pugh
responded: "The police." *Id.* at 102:23-25.  In his declaration,
though, Pugh contradicted this testimony (again without
explanation).  He stated that after the car crash, "I was able
to exit the vehicle on my own and stand up."  Pugh Decl. ¶ 31.

        Plaintiff also contradicted himself regarding the
number of weapons the officers wielded during the alleged
assault.  See note 5, *supra* (complaint alleges one "retractable
metal bar"; in deposition testimony, Plaintiff first referred to
multiple weapons and then said he could not recall if it was one
or more; and in the later declaration, he referred again to a
single weapon).

        d.   Medical Records

        Perhaps even more problematic, however, are the
medical records in this case.  Given that they show no

indications of bruising, these records "*directly and irrefutably*
contradict*" Pugh's claim of excessive force. *Davis*, 2013 WL
5780475, at *4.

Although credibility determinations are generally not
appropriate on summary judgment, district courts may grant
summary judgment where medical records undercut a Plaintiff's
testimony. *Vega v. Rell*, 611 F. App'x 22, 25-26 (2d Cir. 2015)
(affirming district court's grant of summary judgment on
excessive-force claim where "uncontroverted medical records
undercut each" of plaintiff's "counter-assertions of fact");
*Henry v. Brown*, 406 F. Supp. 3d 211, 214 (E.D.N.Y. 2016)
(listing cases); *Felder v. Diebel*, No. 10-CV-343, 2012 WL
6690239, at *5 (W.D.N.Y. Dec. 21, 2012) (granting summary
judgment where plaintiff's medical records "indicate no signs of
injuries consistent with his allegations").

*Davis v. Klein* illustrates how medical records can
overcome a plaintiff's testimony at summary judgment.
In *Davis,* the plaintiff claimed that police officers "threw him
up against a wall and kicked and punched him repeatedly in the
head, face and back."  2013 WL 5780475, at *1.  The plaintiff
received medical attention on the same night.  *Id.*  The court
reviewed the medical records from this treatment and concluded
that they were "wholly inconsistent with and offer[ed] no
support for the type of brutality that Davis allege[d]."  *Id.*

32

Citing the Second Circuit's holding in *Jeffreys*, 426 F.3d at

552, the court held:

> the hospital records from the evening of Davis's
> arrest demonstrate that, at most, Davis had minor
> soreness in his wrist.  If officers had repeatedly
> punched plaintiff during the arrest and booking
> process, as he alleges, it is simply not believable
> that the hospital records would indicate that Davis
> had "no skin abrasions" and that his facial
> appearance was "normocephalic and atraumatic."  These
> medical records, bluntly, directly contradict the
> version of facts plaintiff gave in his complaint as
> well as in his deposition.

*Id.* at *4.

Other courts have granted summary judgment when no

reasonable jury could credit plaintiff's account of excessive

force.  *See, e.g.*, *Jenkins v. Town of Greenburgh*, No. 13-CV-

8845, 2016 WL 205466, at *5 (S.D.N.Y. Jan. 14, 2016) (granting

defendants' motion for summary judgment on excessive-force claim

where medical records made no mention of plaintiff's alleged

thumb injury and where only evidence supportive of that claim

was plaintiff's own deposition testimony); *Jimenez v. City of

New York,* No. 14-CV-2994, 2015 WL 5638041, at *6 (S.D.N.Y. Sept.

24, 2015); *Bove v. City of New York,* No. 98-CV-8080, 1999 WL

595620, at *6 (S.D.N.Y. 1999) (granting summary judgment where

the record contained no physicians' affidavits or hospital

records "to substantiate that the plaintiff's current ailments

exist, let alone that the alleged 'beating' by the NYPD was the

proximate cause of these injuries").

Here, the treatment records render Plaintiff's testimony incredible. As in *Davis*, it is inconceivable that the beating to which Plaintiff testified — fifty to sixty blows, all over his body, with a metal baton (or multiple metal weapons) — would leave no trace of bruising. But the medical record reflects no such trace: the only injuries Plaintiff reported, or medical personnel observed, were the laceration to his head and the fractured knee. The EMTs' Prehospital Care Report reflects those two injuries, Prehospital Rep. at 2, and no others. On the contrary, the EMTs' report memorializes that Pugh's "Skin Color" and "Skin Condition" were both "Normal." *Id.*; *see also id.* at 3 ("SKIN CTC [color, temperature and condition] NORMAL").

Likewise, the extensive medical records — nearly sixty pages — compiled during Plaintiff's week-long stay at Brookdale Hospital reflect no bruising on Plaintiff's body or cuts beyond the laceration on Plaintiff's forehead. The "ED Notes" (emergency department notes) recorded by Sena Gong, M.D., at intake state: "At present, Pt reports facial pain and left knee pain." Brookdale Records at D0250 (ED Provider notes dated December 30, 2017). Notes taken by Muhammed Aman, M.D., a trauma surgeon, on the morning of January 1, 2018 — less than thirty-six hours after Pugh's arrest — reflect the tibial fracture, Plaintiff's alcohol levels in the MVA (motor vehicle accident), and multiple "retained foreign bodies" from a

previous gunshot wound, but state explicitly: "No other injuries identified*." Id.* at D0275.  Likewise, the Physician Discharge Summary dated January 7, 2018 reflects that Plaintiff initially presented with "[s]mall bleeding coming from the forehead lac[eration]," but that his head was "[n]ormocephalic" and "atraumatic"; that his "[s]kin color, texture, [and] turgor" were all "normal"; and that Plaintiff had "no . . . lesions." *Id.* at D0256-D0258.  This total absence of corroboration militates in favor of summary judgment.  *Jeffreys*, 275 F. Supp. 2d at 475-78; *see Davis*, 2013 WL 5780475, at *4 (plaintiff's claim of brutal assault undermined by medical records indicating he was normocephalic, atraumatic, and presented with no skin abrasions); *Bove*, 1999 WL 595620, at *6 (granting summary judgment where, "[a]lthough the plaintiff complained of having been kicked in the shoulder and elsewhere, no bruises were found").

Plaintiff appears to suggest, in his summary judgment brief in opposition and Local Rule 56.1 Statement, that the medical personnel simply failed to document the results of the beating — both the EMTs who triaged him and the doctors at Brookdale Hospital.  *See* Pl. Br. at 16;[17] Pl. 56.1 ¶¶ 64-65

---

[17] Plaintiff's brief states: "As for the Defendants' claims that the medical records do not support Mr. Pugh's version of events, the records are fraught with inconsistencies themselves, outright fabrications . . . ." *Id.*

(Plaintiff "[d]oes not concede to the reliability of the medical records").  But Plaintiff's bald assertion that the medical records are "fabrications" is insufficient to create an issue of fact.  *See Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 469–70 (S.D.N.Y. 1998) (granting summary judgment where medical records contained no indication of the injuries plaintiff claimed, and "Plaintiff offers no reasonable basis for disbelieving his medical records, but only asserts that his medical records are inaccurate") (citing *Candelaria v. Coughlin*, 787 F. Supp. 368, 374 (S.D.N.Y.), *aff'd*, 979 F.2d 845 (2d Cir. 1992)).  Here, too, Plaintiff offers no reasonable basis on which to conclude that the medical records (two sets of them, produced by multiple, unrelated parties — the EMTs and then the hospital personnel) omitted such critical evidence.

    These contradictions — both Plaintiff's contradiction of his own testimony, and the extrinsic contradictions in the medical records and elsewhere — are a basis for dismissal.  As then-Judge Sotomayor wrote when granting summary judgment in *Shabazz*, "when the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court may] pierce the veil of the complaint's factual allegations . . . and dismiss the claim."  994 F. Supp. at 470; *see also, e.g., Juarbe v.*

---

Plaintiff does not identify these alleged inconsistencies, however, and (more importantly) has not adduced any evidence to suggest that the medical records are the product of fabrication.

*Carnegie*, No. 15-CV-1485, 2018 WL 3121635, at *8 (N.D.N.Y. Feb. 16, 2018)*, report and recommendation adopted,* No. 15-CV-1485, 2018 WL 1441331 (N.D.N.Y. Mar. 22, 2018) (granting summary judgment where, "given plaintiff's changing version of the relevant events, his assault conviction, and particularly his statement, shortly after the incident, to the effect he did not remember what occurred, . . . the evidence supporting his claims is too incredible to be believed by reasonable minds") (cleaned up); *Schmidt v. Tremmel*, No. 93-CV-8588, 1995 WL 6250, at *3 (S.D.N.Y. Jan. 6, 1995) ("No reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [the plaintiff's *Bivens*] complaint or in her subsequent missives to the court.").

Plaintiff attempts to salvage the assault allegation by proffering the expert report of Dr. Mark McMahon, addressed to Plaintiff's counsel and dated December 27, 2019. ECF No 61-14 ("McMahon Rep."). Dr. McMahon's report describes Pugh's injuries from the night of December 30, 2017 (for example, Pugh had an "episode of loss of consciousness due to his head striking the steering wheel," a "laceration on his left forehead," and a "displaced fracture involving the medial and lateral tibial plateaus"). *Id.* at 1. He describes other aspects of Pugh's medical history (an "old fracture of the patella with retained shrapnel"; "bullet fragments in the

37

pelvis"; "large traverse forehead laceration as a result of a motorcycle accident 17 years ago"). *Id.* at 2-3. He describes Pugh's continuing symptoms ("ongoing pain" in the left knee that "is worse with weather changes and worse with movement"). *Id.* at 3. He reports the observations of an examination (extension strength and flexion strength). *Id.* at 4. And then, without any apparent analysis or description of method, he sets forth his conclusion on "Causation": "In all likelihood," he says, the knee fracture "occurred as a result of the car accident and the blows to the knee." *Id.* Dr. McMahon says nothing at all about *why* the fracture might be more consistent with a car accident, baton assault, or combination of the two, other than to refer (in passing) to the "magnitude" of the injury. *Id.*

Dr. McMahon's report and conclusion are inadmissible under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Those authorities dictate that a trial court must evaluate an expert's opinions and methodology for reliability and relevancy. The expert's assertions must be grounded in the methods and procedures of science and must amount to more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. To be found reliable, expert testimony and the scientific evidence on which it is based must have "a traceable, analytical basis in objective fact." *Bragdon v. Abbott,* 524 U.S. 624, 653

(1998); *see Sweet v. Electronic Data Systems, Inc.*, 1996 WL 204471, at *6 (S.D.N.Y. Apr. 26, 1996) (expert's conclusory allegations, "absent a statement of the facts upon which they are based, are as insignificant as the conclusory allegations of a party, his attorney, or any other witness").  An expert must explain "how and why he reached his conclusion," *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 437–38 (W.D.N.Y. 2001); courts do not credit opinions "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  The burden is on the proponent of the testimony to establish its admissibility by a preponderance of proof.  *See Daubert*, 509 U.S. at 592 n. 10; *Reed Const. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 398 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ("The burden is on the proponent of the expert's testimony to prove that it is admissible.").

Dr. McMahon provides nothing beyond his conclusory statement of the cause of Plaintiff's injury.  To the extent he is simply relying on his experience, he is obliged to "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs.*, LLC, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid.

702 advisory committee's note).  "The trial court's gatekeeping function requires more than simply taking the expert's word for it."  *Piepes v. NAI Ent. Holdings LLC*, 394 F. Supp. 3d 315, 318 (E.D.N.Y. 2019) (quoting Fed. R. Evid. 702 advisory committee's note).  For that reason, the Court is constrained to exclude Dr. McMahon's report.  *See id.* ("An unexplained opinion — because it makes it impossible to conduct any *Daubert* inquiry — is per se inadmissible.").

                    *         *         *         *         *

        For all these reasons, this case implicates the Supreme Court's directive that "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Summary judgment is granted in favor of Defendants on the excessive force and failure to intervene claims.[18]

---

[18] Plaintiff adduced insufficient admissible evidence that Officer Sikora was present at the scene during the alleged assault, and therefore the excessive force claim against him is dismissed on that ground as well.  *See Corley v. Shahid*, 89 F. Supp. 3d 518, 523 (E.D.N.Y. 2015) (police officer is "personally involved" in the use of excessive force if he "(1) directly participates in an assault; or (2) was present during the assault, but did not intervene on behalf of the *victim even though he had a reasonable opportunity to do so*").

**B.   Deliberate Indifference to Medical Needs**

Pugh contends that the officers demonstrated "deliberate indifference" to his medical needs in the delay of his medical treatment.  Claims of delayed medical treatment made by arrestees are addressed under the Due Process Clause of the Fourteenth Amendment.  *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996); *see also Goodwin v. Kennedy*, No. 13-CV-1774, 2015 WL 1040663, at *7 (E.D.N.Y. Mar. 10, 2015) (applying the deliberate indifference standard of the Due Process Clause of the Fourteenth Amendment to arrestees' denial of medical treatment claims).  Where a claim concerns a temporary delay in the provision of medical treatment, the focus is on the "particular risk of harm faced by a [detainee] *due to* the challenged deprivation of care" rather than the detainee's "underlying medical condition, considered in the abstract."  *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (emphasis added); *Edmonds v. Cent. N.Y. Psychiatric Ctr.*, No. 10-CV-5810, 2011 WL 3809913, at *4 (S.D.N.Y. Aug. 25, 2011).  In order to prevail, a plaintiff must show that his condition actually worsened as a result of the delay.  *See Smith*, 316 F.3d at 186; *Frith v. City of New York*, 203 F. Supp. 3d 386, 390 (S.D.N.Y. 2016) (denial of medical treatment standard not met where plaintiff alleged a one-day delay in treatment, but not "that the delay itself caused or exacerbated [his] infection, caused him extreme pain,

41

or caused any permanent harm"); *Rodriguez v. City of New York*, 802 F. Supp. 2d 477, 482 (S.D.N.Y. 2011) (granting summary judgment on deliberate-indifference claim where plaintiff "present[ed] no evidence that his condition worsened as a result of the three-day delay between his request and receipt of medical attention").  In the alternative, a plaintiff may recover for deliberate indifference if the delay is "very likely" to result in future harm.  *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993).

Here, Plaintiff's deposition testimony is muddled on the question of when he raised medical concerns and what he told the officers.  It is uncontested, however, that Plaintiff complained about his knee at some point during the drive from the site of the accident to the precinct.  *See* Casimir Dep. 145:14-146:3.  Plaintiff appears to allege that the delay between (a) the time the officers knew the severity of his injuries and (b) the arrival of the EMTs at the police precinct was the product of deliberate indifference to his medical needs.  *See* Compl. ¶¶ 20-22, 37; *see also* Pl. Br. at 17.  The uncontested record establishes that this delay lasted no longer than one hour.  Accident Rep. at D001 (accident occurred at approximately 3:58 a.m.); Prehospital Rep. at 1 (EMS arrived at 4:33 a.m.)

Plaintiff has adduced no evidence whatsoever that his condition actually worsened as a result of this delay. *See Smith*, 316 F.3d at 186. (Dr. McMahon does not address the question.) Nor does Plaintiff contend that he is "very likely" to suffer as-yet undiscovered future harm. *Helling*, 509 U.S. at 33.

Plaintiff did testify that he complained about his knee prior to the EMTs' arrival, though he was inconsistent on this topic as well. *See* Pugh Dep. 101:19-20 ("When they got me in the patrol car, I explained about my knee and they told me to shut up."); *but see id.* at 108:14-16 ("They took me away to the precinct [after the assault] *and that is when I complained* to the sergeant and captain about my leg.") (emphasis added); 121:3-5 (Q. Any point of time, did you make any complaints regarding your knee?  A. I can't recall.). "Extreme" pain can give rise to deliberate-indifference liability when it is left untreated for a significant period of time or degeneration is likely. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (plaintiff must show "that the alleged deprivation [is] sufficiently serious in the sense that [it is] a condition of urgency, one that may produce death, degeneration, or extreme pain"); *see Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (six-month delay in treatment for a dental condition that led to infection and extreme pain sufficiently serious).

43

Here, the only record evidence that Pugh reported the *severity* of his pain concerns the time period after the EMTs' arrival.  Prehospital Rep. at 3 ("PT STS [PATIENT STATES] PAIN IS 8 OUT OF 10").  Moreover, the record shows that the police called an ambulance nineteen minutes after the accident.  *See* Accident Rep. at D001 (accident occurred at 3:58 a.m.); Prehospital Rep. at 1 (EMS called at 4:17 a.m.); Pugh Dep. 101:19-20 ("When they got me in the patrol car [in between these two events], I explained about my knee.").  The record reveals no reason to believe that the officers could have acted significantly sooner, especially in light of the uncontested fact that Pugh's crash resulted in damage to a third party's vehicle, as well.  *See Rodriguez v. Mercado*, No. 00-CV-8588, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002) (noting that patients "seeking care for a non-life-threatening injury generally experience[] some delay in receiving treatment" and finding no constitutional violation based on an eight- or nine-hour delay).

In sum, the facts here fall short of those in cases in which courts have found an objectively serious injury.  *See, e.g.*, *Liscio v. Warren*, 901 F.2d 274, 276-77 (2d Cir. 1990), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009) (deliberate indifference liability generally reserved for occasions where officials ignored a "life-

44

threatening and fast-degenerating" condition); *cf. Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at *20 (E.D.N.Y. Aug. 22, 2017)*, report and recommendation adopted*, No. 16-CV-3674, 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017) (deliberate indifference found where the delay "forced [doctors] to rebreak Plaintiff's arm and install metal plates and screws").  This claim is therefore dismissed.  *See Walker v. Kubicz*, 996 F. Supp. 336, 341 (S.D.N.Y. 1998) (prison doctors' failure to treat and diagnose prisoner's pneumonia was not deliberate indifference; plaintiff's treatment was delayed by only one day and he was given emergency care once aware his symptoms were serious).

## C.   *Monell* and Supervisory Liability

        The failure to establish any individual defendant's liability requires the dismissal of Plaintiff's municipal and supervisory claims.  "[W]hen a plaintiff lacks any underlying claim of a deprivation of a constitutional right, the claim of municipal liability on the part of the municipal defendant must be dismissed as well."  *Lener v. Hempstead Public Schs.*, 55 F. Supp. 3d 267, 283 n.14 (E.D.N.Y. 2014) (citing *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.")); *see also*

*Raspardo v. Carlone*, 770 F.3d 97, 128 (2d Cir. 2014) (where there is no underlying constitutional violation there can be no supervisory liability); *Stewart v. Schiro*, No. 13-CV-3613, 2015 WL 1854198, at *16 (E.D.N.Y. Apr. 22, 2015) ("The court has already determined that Plaintiff failed to demonstrate an underlying constitutional violation . . . . Therefore, the *Monell* claim necessarily fails."); *Elek v. Inc. Village of Monroe*, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) ("Absent an underlying constitutional violation, there is no cognizable claim for supervisor liability."). Here, Plaintiff seeks to hold the City liable for a failure to discipline the defendant officers. Because the officers are entitled to summary judgment as to their individual liability, the *Monell* and supervisory liability claims are dismissed.

**D.   Leave to Amend**

Finally, Plaintiff seeks to amend his complaint to add facts related to Officer Sikora. Magistrate Judge Mann previously denied this exact request twice. Plaintiff's attempt to challenge Judge Mann's ruling through this renewed application is, once again, denied because he has not shown good cause for the delay in bringing it.

Plaintiff's request to amend the complaint is governed by Rules 15 and 16 of the Federal Rules of Civil Procedure. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 243 (2d

46

Cir. 2007).  The deadline to amend – June 7, 2019 – was set out
in the Court's scheduling order of April 23, 2019.  ECF No. 9.
Since Plaintiff's request to amend comes long after the deadline
instituted, the Plaintiff must show good cause for his delay.
*See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d
Cir. 2000).  Judge Mann held that Plaintiff had not shown good
cause to modify her order then, *see* ECF Nos. 16 (minute entry
and order for proceedings held on November 4, 2019), 32
(transcript of proceedings held on November 4, 2019); nor has he
done so now.

Plaintiff previously contended that he did not know
that Officer Sikora was driving the vehicle that allegedly
struck him until the deposition of Officer Casimir on November
27, 2019, but that information was provided on April 23, 2019.
*See* Transcript of Proceedings held on November 4, 2019 5:2-
11:19, ECF No. 32.  Judge Mann concluded that Defendants had
identified Officer Sikora as a witness with knowledge of the
incident as of April 2019 and Plaintiff simply failed to either
amend or to clarify Officer Sikora's role in the incident.  *Id.*
Furthermore, Plaintiff filed a letter with the Court on June 28,
2019, stating he was considering adding Sikora to the caption,
but then failed to file an actual motion to amend for four
additional months.  *Id.* at 11:4-19; *see Mathis v. United Homes,*
*LLC*, 607 F. Supp. 2d 411, 437 (E.D.N.Y. 2009) (court "may deny a

47

motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed").  Accordingly, Judge Mann properly concluded that Plaintiff had not shown good cause for his failure to amend within the time allotted.  Transcript of Proceedings held on November 4, 2019.

There would be substantial prejudice to Defendants in granting Plaintiff's late request.  *See, e.g.*, *Werking v. Andrews*, 526 F. App'x. 94, 96 (2d Cir. 2013) ("We are particularly likely to find prejudice where the parties have already completed discovery and the defendant has moved for summary judgment."); *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (affirming denial of motion to amend as "especially prejudicial given the fact that discovery had already been completed and [the defendant] had already filed a motion for summary judgment").  Plaintiff initiated this action over two-and-a-half years ago and discovery has long since concluded.  To allow Plaintiff to amend the complaint again now, after years of litigation, would work substantial prejudice.

Finally, this proposed amendment would be futile, in light of the contradictory evidence set forth above.[19]

## V.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted as to each of the federal claims. Plaintiff's motion for leave to amend the complaint is denied. The Court declines to exercise supplemental jurisdiction over the state-law claims.  The Clerk of Court is respectfully directed to enter judgment and close this case.


SO ORDERED.



/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:    September 29, 2021
          Brooklyn, New York

_____

[19] Plaintiff's claims against the John Doe defendants are also dismissed because he has proffered insufficient evidence of a constitutional injury or their personal involvement therein – an argument he appears to concede. *See* Pl. Br. at 19; *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). It is also well settled that when "discovery has closed" and unnamed defendants remain unidentified, "the proper course is to dismiss the John Doe Defendants." *Cox v. Village of Pleasantville*, 271 F. Supp. 3d 591, 618 (S.D.N.Y. 2017).  Here, given the Plaintiff's failure of proof on whether assault occurred at all, that dismissal must be with prejudice.